IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

_____

| | | |
|---|---|---|
| STEPHEN C. WALKER, PRO SE,<br>    also known as<br>    STEPHEN CLAYTON WALKER,<br>TDCJ-CID No. 1417300,<br><br>        Plaintiff,<br><br>v.<br><br>MICHAEL D. SAVERS,<br>JIMMY CORLEY,<br>GRANDVILLE SANDERS,<br>BRAD LIVINGSTON,<br>SHAWN WATSON,<br>RUSSELL BOCKMON, and<br>OTHER UNKNOWN OFFICERS,<br>        Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | 2:11-CV-0094 |

**REPORT AND RECOMMENDATION TO
DENY PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AND GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This case involves what is primarily a conditions of confinement challenge to the

working environment of plaintiff's prison job, along with claims of deliberate indifference,

retaliation, conspiracy, a challenge to the constitutionality of TDCJ Rule 44q, and claims of

negligence and gross negligence.  Under consideration is defendants' August 20, 2012 Motion

for Summary Judgment [D.E. 52], with Brief and Exhibits in support, as well as defendants'

August 21, 2012 Exhibit C.  The Court has also considered plaintiff's September 24, 2012

Motion for Partial Summary Judgment [D.E. 59], and his response to defendants' motion for

summary judgment, with exhibits, declaration, and brief in support, as well as defendants'

October 8, 2012 "Motion for Summary Judgment Reply" [D.E. 65].  The Court has considered

these and all other relevant pleadings.

The live complaint, found at Docket Entry # 19, was filed February 24, 2012.

On January 4, 2012, the Court issued its Order Granting Plaintiff's Motion to Dismiss defendant Texas Department of Criminal Justice and Order of Dismissal [D.E. 15], dismissing plaintiff's claims against defendant Texas Department of Criminal Justice without prejudice. In addition, by Order Granting Defendants' Motion to Dismiss under Rule 12 and Order of Partial Dismissal issued May 2, 2012 [D. E. #31] all claims asserted under the Texas Tort claims Act were Dismissed with Prejudice, all claims against defendant LIVINGSTON except those for future injunctive relief were Dismissed with Prejudice, and all claims for monetary relief against defendant SAVERS in his official capacity were Dismissed with Prejudice.

Plaintiff's remaining claims are asserted against all defendants in their individual capacities, with the exception of defendant LIVINGSTON, whom plaintiff claims has maintained an unconstitutional rule, TDCJ Disciplinary Rule 44q, which plaintiff argues is unconstitutionally void for vagueness.

Plaintiff requests an award of costs, compensatory and punitive damages, as well as injunctive relief requiring defendants to cease implementing Disciplinary Rule 44q and to strike that rule from publication. Plaintiff also requests the return of a confiscated typewriter.

## UNDISPUTED FACTS

At all times relevant to the instant suit, plaintiff was a prisoner housed at the TDCJ Jordan Unit and was assigned to work as a mechanic maintaining, repairing, and rebuilding TDCJ equipment and vehicles. At all times relevant to the instant suit, defendants SAVERS, BOCKMON, SANDERS, CORLEY and WATSON were employed by the Texas Department of

2

Criminal Justice and were acting under color of state law.  Defendant LIVINGSTON was, and still is, the Executive Director of the Texas Department of Criminal Justice.

Plaintiff was required to work in a shed, called the inside yard shack.  On December 8, 2010, plaintiff burned[1] the side of his face on the hot exhaust pipe of a Kawasaki Mule he was repairing.  Upon reporting his injury to defendant Sgt. SANDERS, defendant SANDERS sent plaintiff to the infirmary for treatment.  Plaintiff was given a disciplinary case by defendant SANDERS for violating Rule 44q, i.e., committing an unsafe act.  Plaintiff was later written three more disciplinary charges by defendant CORLEY in a second disciplinary case for failure to obey an order, unauthorized use of tools, and destruction of state property.  Plaintiff was found guilty of all of the disciplinary charges and received a verbal reprimand and temporary loss of privileges, as well as an assessment of $206.27 for damages he was found to have caused to the Kawasaki Mule.  The disciplinary case for committing an unsafe act was later overturned, to be reheard at the option of unit officials.  The unsafe act was described in the initial disciplinary case as "[s]aid offender was working on the Mole[sic], went to get up and burned his face on the muffler."  The case was reheard, at which time the unsafe act was described in the succeeding disciplinary case as "[s]aid offender after operating the Mule and not allowing it to cool off did work on the Mule.  Offender Walker then stood up and burned his face on the muffler."

On January 6, 2011, plaintiff received a third disciplinary case by an Officer Devaney for possession of contraband.  Plaintiff pled guilty to that offense and, in addition to forfeiture of the

---

[1]Plaintiff claims it was a second degree burn.  Defendants contend it was a first degree burn.  Defendant SANDERS averred the burn "looked like a little red mark on his cheek and appeared very minor.  [Defendants' Exhibit C3 to defendants' motion for summary judgment.]  Defendant WATS0N averred "The medical providers noted that offender Walker did not have any blistering or peeling to the area where he was burned." [Defendants' Exhibit E3 to defendants' motion for summary judgment.]  The exact extent of the burn is not an issue of material fact.

contraband property and temporary restriction of privileges, plaintiff lost 30 days of accumulated

goodtime credit.  Plaintiff claims all of these disciplinary cases were retaliatory, were frivolous,

and that his typewriter was wrongfully confiscated as part of his punishment for the last case.

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants have submitted the following summary judgment evidence:

| | |
|---|---|
| Defendants' Exhibit A | The sworn Affidavit of defendant Warden Michael SAVERS; |
| Defendants' Exhibit B | The sworn Affidavit of defendant Lt. Russell BOCKMON; |
| Defendants' Exhibit C | The sworn Affidavit of defendant Sgt. Granville SANDERS; |
| Defendants' Exhibit D | The sworn Affidavit of defendant Officer Jimmy CORLEY; |
| Defendants' Exhibit E | The sworn Affidavit of defendant Shawn WATSON; and |
| Defendants' Exhibit F | Plaintiff's TDCJ disciplinary records for the period of December 2010 – May 2011). |

Defendants argue they are entitled to qualified immunity against plaintiff's claims under

section 1983; that plaintiff's § 1983 claims for retaliation are barred by *Heck v. Humphrey*, 512

U.S. 477, 114 S.Ct. 2364, 2372, 129 L.Ed.2d 383 (1994); plaintiff's disciplinary convictions

were valid; plaintiff has failed to present evidence supporting his claim of conspiracy; plaintiff

has not shown his working conditions were constitutionally infirm; defendants are immune from

plaintiff's state law negligence claims; plaintiff has not shown defendants acted with either

negligence or gross negligence; TDCJ Rule 44q is not unconstitutionally vague; and defendants

are entitled to Eleventh Amendment immunity from claims for damages in their official

capacities.

## PLAINTIFF'S RESPONSE

Plaintiff responds by presenting the following summary judgment evidence:

| | |
|---|---|
| Plaintiff's Exhibit 1 | Typewritten document purporting to be a copy of AD – 10.20 |
| Plaintiff's Exhibit 2 | Typewritten document purporting to be a copy of ED – 10.61 |
| Plaintiff's Exhibit 3 | Plaintiff's Statement (not made under penalty of perjury) responding to various disciplinary cases |
| Plaintiff's Exhibit 4 | Responses by Defendant SAVERS to plaintiff's Requests for Admissions |
| Plaintiff's Exhibit 5 | A Risk Management Comprehensive Inspection Sheet for the "Field/Turnout-I/O Yard" dated December 2010 |
| Plaintiff's Exhibit 6 | Official Statement by Shawn WATSON |
| Plaintiff's Exhibit 7 | Step One Grievance # 2011131550 |
| Plaintiff's Exhibit 8 | Transmittal Letter for Defendant's Motion for Summary Judgment, Exhibits A, G, D, E, F, and Proposed Order from Texas Attorney General |
| Plaintiff's Exhibit 9 | Unsworn Declaration under Penalty of Perjury by Inmate William F. Herrington |
| Plaintiff's Exhibit 10 | Official Statement by Shawn WATSON |
| Plaintiff's Exhibit 11 | Official Statement by Russell BOCKMON |
| Plaintiff's Exhibit 12 | A note purportedly from Maintenance regarding a building on the Jordan Unit |

Plaintiff also submitted his own unsworn declaration under penalty of perjury (D.E. #61).

Plaintiff argues he has shown his conditions of confinement at his work assignment were unconstitutional; his § 1983 claims are not barred by *Heck*; Rule 44q is unconstitutionally vague; that the defendants conspired against him; the defendants are not entitled to qualified

immunity; the defendants are not entitled to Eleventh Amendment Immunity; he has presented evidence showing the defendants acted with negligence and gross negligence; and the defendants are not immune from state common law negligence claims.

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

By his September 24, 2012 Motion for Partial Summary Judgment [D.E. #59], plaintiff requests summary judgment against defendants BOCKMON, SANDERS, and CORLEY on plaintiff's conditions of confinement claims and against defendants SAVERS, CORLEY, and SANDERS on plaintiff's retaliation claims.

In support of this motion, plaintiff presents another copy of his Exhibit 5 to his summary judgment response, another copy of his Exhibit 11 to his summary judgment response, and a new Declaration under penalty of perjury.

Defendants have not filed any response specific to this motion, unless it is defendants' October 8, 2012 "Motion for Summary Judgment Reply" [D.E. 65]; however, this appears to be a reply to plaintiff's response to defendants' motion for summary judgment.

## THE STANDARD OF SUMMARY JUDGMENT REVIEW

Summary judgment may be granted where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Federal Rule of Civil Procedure 56(a).  Consequently, after adequate time for discovery and upon motion, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on

which that party bears the burden of proof. *Celotex v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Only disputes of fact that could affect the outcome of the suit at trial will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A complete failure of proof concerning an essential element of the nonmoving party's case is fatal and entitles the moving party to judgment as a matter of law. *Celotex v. Catrett*, 477 U.S. at 322-23, 106 S.Ct. at 2552. A motion for judgment as a matter of law is properly granted when the facts and inferences point so strongly in favor of the movant that a rational jury could not arrive at a contrary verdict. If there is substantial evidence, that is, evidence of such quality and weight that reasonable and fair-minded jurors might reach a different conclusion, then the motion for judgment as a matter of law should be denied. *Waymire v. Harris County, Texas*, 86 F.3d 424, 427 (5th Cir. 1996).

## THE STANDARD OF SUMMARY JUDGMENT REVIEW
## UPON A PLEA OF QUALIFIED IMMUNITY

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 199-200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth*, 472, U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Since qualified immunity depends on whether the defendant violated a clearly established constitutional right, a preliminary inquiry must be made whether the plaintiff has asserted a violation of any constitutional right at all. *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789,

7

1793, 114 L.Ed.2d 277 (1991).  Analysis at this stage is performed under the "currently

applicable constitutional standards."  *Rankin v. Klevenhagen*, 5 F.3d 103, 106 (5th Cir. 1993).

The second prong of the qualified immunity test is whether the constitutional right alleged to

have been violated was clearly established at the time of the incident; and, if so, whether the

conduct of the defendant was objectively unreasonable in  light of contemporaneous clearly-

established law.  *Hare v. City of Corinth*, 135 F.3d 320, 328 (1998).  Although analysis under the

first prong requires the court to consider currently applicable constitutional standards, analysis

under the second prong requires a court to measure the objective reasonableness of an official's

conduct with reference to the law as it existed at the time of the conduct in question.  *Id.* (citing

*Rankin v. Klevenhagen*, 5 F.3d 103, 108 (5th Cir. 1993).

 In deciding which of the two prongs to address first, the court may utilize its sound

discretion in light of the circumstances in the particular case at hand.  *Pearson v. Callahan*, 555

U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

 Although it may be "difficult to imagine factual circumstances in which a trier of fact

could find deliberate indifference as defined by *Farmer*[2] and nevertheless conclude that a

reasonable person in defendant's position was not chargeable with knowledge that his or her

actions violated the plaintiff's clearly established constitutional rights," in analyzing a claim of

qualified immunity, the test is objective reasonableness, not subjective deliberate indifference.

*Hare v. City of Corinth*, 135 F.3d 320, 328 (5th Cir. 1998)(quoting *Briecke v. Coughlin*, No. 92-

CV-1211, 1994 WL 705328 at 6 (N.D.N.Y.Dec. 16, 1994).  Consequently, at the qualified

---

[2]Deliberate indifference is defined as a failure to act where prison officials have knowledge of a substantial risk of serious harm to inmate health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811 (1994).

immunity stage, the deliberate indifference standard only allows an examination of whether, under the standard not to be deliberately indifferent, the acts or omissions of the defendant were objectively unreasonable as a matter of law.  *Hare v. City of Corinth*, 135 F.3d 320, 328 (5th Cir. 1998).

## ANALYSIS OF PARTIES' MOTIONS FOR SUMMARY JUDGMENT

### ELEVENTH AMENDMENT IMMUNITY

Defendants argue they are entitled to Eleventh Amendment immunity from claims for damages in their official capacities.  The Eleventh Amendment has been interpreted by the Supreme Court to bar suits by individuals against nonconsenting states. *Bd. of Trs. of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001).  In addition, the principle of state-sovereign immunity generally precludes actions against state officers in their official capacities, *see Edelman v. Jordan,* 415 U.S. 651, 663-69, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), subject to an established exception: the *Ex parte Young* doctrine.  Under *Ex parte Young,* "a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law." *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

As plaintiff points out, the claims remaining in this suit are brought against defendants CORLEY, SAVERS, SANDER, BOCKMON, and WATSON in their individual capacity, not their official capacity.  The only defendant sued in his official capacity is defendant LIVINGSTON, who is sued for prospective equitable relief only.  Therefore, there does not appear to be any dispute regarding Eleventh Amendment Immunity.  To the extent there is any dispute, defendants are not entitled to Eleventh Amendment immunity against plaintiff's claims

9

against them in their individual capacity, but any remaining claims for monetary relief against one or more defendants in their official capacity are barred.

**WORKING CONDITIONS AND QUALIFIED IMMUNITY**

In its prohibition of "cruel and unusual  punishments," the Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must "take reasonable  measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)(quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)).  A prisoner asserting a claim that conditions of confinement constituted cruel and unusual punishment must show deliberate indifference on the part of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).  The appropriate definition of "deliberate indifference" under the Eighth Amendment is "subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1980, 128 L.Ed.2d 811 (1994); *Reeves v. Collins*, 27 F.3d. 174 (5th Cir. 1994). In this regard the Supreme Court has cautioned:

> [A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan*, 511 U.S. at 837-38, 114 S.Ct. at 1979.  It is only under exceptional circumstances that a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk.

By his Declaration [D.E. 61] in support of his response to defendants' summary judgment motion, plaintiff states the Inside Yard Shack where he worked as a mechanic has a raised

10

concrete floor, is about 12 feet by 12 feet[3] and is constructed of old, used, or recycled lumber and corrugated tin sheeting. [Plaintiff's Declaration [D.E. 61] at p.2, par. 4].  Since the tin sheeting is recycled, it has holes from previous nails and the roof leaks through those holes.  Plaintiff says sometimes his jacket got wet and he was cold when he worked there, but defendants CORELY, SANDERS, and BOCKMON, ignored his complaints.  Plaintiff complains he was not given extra clothing as was provided for inmates working outside.

In his Second Amended Complaint [D.E. 19], plaintiff alleges the Inside Yard Shack where he worked was not safety checked by the defendants and the deficiencies were not logged or corrected.

Despite this allegation, plaintiff avers, in his Declaration [D.E. 61] supporting his summary judgment response, that the Jordan Unit Safety Officer, defendant WATSON, "entered the shack approximately once a month, noted what was being done in the sahck [sic] and checked the fire extenguisher [sic] but at no time did he physically inspect the structural iontegrity [sic] of the shack or note its deficiencies, rott [sic] and dangers, nor did any other employee of the TDCJ."

Plaintiff cannot have personal knowledge of what defendant WATSON noted and, aside from his repeated conclusory statements, plaintiff has not presented any evidence that the structural supports for the shack presented a serious risk of substantial harm.  Defendant WATSON has presented his sworn Affidavit stating once a month he performed a safety inspection on every building on the Jordan Unit, including the shed where plaintiff worked [Defendants' Exhibit E1 to defendants' motion for summary judgment].

---

[3]Defendants contend the shed is 20 ft. by 15 ft. and contains a locked cage full of tools. [Aff. of Sgt. Granville Sanders [D.E. 53] Defendants' Exhibit C1].

As to the condition of the electrical wiring, etc., plaintiff says "I told Shawn Watson of the eleectrical [sic] and that we were fixing it." [Plaintiff's Declaration [D.E. 61] in support of his response to defendants' summary judgment motion p. 2, par. 5].  Thus, it appears that, at some unidentified time, plaintiff had told WATSON of an unspecified problem with "the electrical" and had represented to him that it was being fixed.

Plaintiff has also submitted Plaintiff's Exhibit 5, a Risk Management Comprehensive Inspection Sheet for the "Field/Turnout-I/O Yard" dated December 2010 which shows the result of the December 2010 inspection of the Inside Yard Shack by defendant WATSON for the very month of plaintiff's accident.  Next to the question:  Are all work areas clean, sanitary, orderly and adequately illuminated, defendant WATSON checked the box for "No."  He then noted, "area cluttered with tools and parts, no aisles."  The only other deficiency noted was in the area of Work Station Ergonomics.  By the question: Are sharp edges on work surfaces covered to prevent accidental cuts/abrasions, defendant WATSON check the box for "No" and noted "Edges not covered."  Under the category of Electrical and Powered Equipment Defendant WATSON noted all electrical cords and wiring were in good condition (i.e., no exposed wires, cracked insulation, etc.). [Plaintiff's Exhibit 5].

Plaintiff states the shed had exposed wiring, burned outlets, and one light bulb. [Plaintiff's Declaration D.E. 61 at p. 2 par. 4-5].  Despite the multitude of defects plaintiff attributes to the Inside Yard Shack, he only identifies two as causing or contributing to his injury: a slippery floor and inadequate lighting.

Plaintiff has not alleged, much less presented evidence showing the other complained-of conditions in his workplace, i.e., the rotted timbers; the tin roof and sides which did not keep out

all of the wind, cold, or heat; and the failure to provide clothing for outdoor work (the Court notes plaintiff was not working out of doors, but inside the shed) posed an excessive risk of harm to plaintiff.  Even factoring in the allegations of inadequate lighting and a slippery floor, it appears that, at most, plaintiff was subjected to nothing more serious than discomfort and inconvenience.

Plaintiff states the reason he burned his face was because he slipped on the slick floor and because the lighting was inadequate.  In his Declaration [D.E. 61], plaintiff avers:

> If I would had [sic] have had adequate light a nonslippery floor, I would not have been hurt.  There was no working drop light as the bulb had been broken for a long time.

[Plaintiff's Declaration [D.E. 61] at p.5 par. 22].

Thus, it appears that the alleged inadequate lighting is based on the fact that the light bulb in the working drop light was burned out or broken and that factor, combined with the slippery floor is what plaintiff claims caused him to burn the side of his face.

Defendant's offer their affidavit testimony [Defendants' Exhibit A, B, D, E, and Docket Entry 53] that plaintiff did not complain to them of defects in the shed.  As defendants point out in their October 8, 2012 Motion for Summary Judgment Reply, plaintiff does not allege nor has he presented evidence that he submitted any grievance on any of the alleged defects of the Inside Yard Shack before the accident.  Further, though plaintiff argues he and other offenders prepared the safety inspection paperwork for TDCJ employees, signing their supervisors' names at their direction, [Plaintiff's Declaration [D.E. 61] at p. 2-3, par. 6], plaintiff admits he never included any of the alleged deficiencies on any of that paperwork.

Given the record evidence in this case, it is clear that, even if a slippery floor and a broken light bulb on a working drop light are considered, solely for purposes of argument, to

13

constitute conditions which created a risk to inmate safety, plaintiff has failed to present evidence showing the risk was indeed "excessive" nor has he shown that the defendants, or any of them, knew of and disregarded such excessive risk to inmate health or safety. Furthermore, plaintiff ignores his own conduct, which he does not dispute, of attempting to adjust the Kawasaki engine's idle, without first giving it time to cool off.

Plaintiff has not presented evidence showing the condition of the Inside Yard Shack was constitutionally deficient or that the defendants were deliberately indifferent to plaintiff's safety with respect to the condition of that shack. Plaintiff has failed to produce evidence to sustain his conditions of confinement or his deliberate indifference claims, and defendants have shown they are entitled to qualified immunity on these claims.

**CONSPIRACY**

Plaintiff claims the three disciplinary cases [Defendants Exhibit F29, F22, F36 and F51] on five disciplinary charges he received subsequent to the accident were written in retaliation for his threat to sue. Further, plaintiff alleges the defendants all conspired to retaliate against him and the fact that these cases were written is proof of that conspiracy because they could not have been written without all of them cooperating together.

Defendants deny plaintiff's claims of conspiracy and contend plaintiff's disciplinary cases were written because of his conduct and accurately reflect disciplinary violations committed by plaintiff. [Defendants' Exhibits A, B, D, E, and Docket Entry 53].

It is well settled that "'mere conclusory allegations of conspiracy cannot, absent reference to material facts,' state a substantial claim of federal conspiracy." *McAfee v. 5th Circuit Judges*, 884 F.2d 221 (5th Cir. 1989), *cert. denied*, 493 U.S. 1083, 110 S.Ct. 1141, 107

L.Ed.2d 1046 (1990).  Although plaintiff contends it required all of the defendants to write the disciplinary cases against him, plaintiff brings no evidence to support this conclusion.  Plaintiff has presented no evidence of any material fact to support his claim that all the defendants conspired against him to chill his First Amendment right to seek redress of grievances.  Instead, his own account shows the cases were brought at different times by different people based on the decisions and understanding of the officers who wrote them.  Plaintiff has failed to support his claim of conspiracy with an allegation of material fact and has failed to state a claim on which relief can be granted.

**RETALIATION**

To claim retaliation, a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation.  *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998).  Moreover, causation requires the plaintiff show that but for the retaliatory motive, the adverse act would not have occurred.  *McDonald*, 132 F.3d at 231.  Finally, the retaliatory adverse act must be more than inconsequential or *de minimis*, that is, it must be capable of deterring a person of ordinary firmness from further exercising his constitutional rights.  *Morris v. Powell*, 449 F.3d 682 (5th Cir. 2006).

An action motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, when taken for a different reason, might have been legitimate.  *Woods v. Smith*, 60 F.3d 1161, 1165 (5th Cir. 1995).  Nevertheless, prisoners must not inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around them; therefore, trial courts must carefully scrutinize these claims.  To state a retaliation claim, an

inmate must allege violation of a specific constitutional right and be prepared to establish that but for the retaliatory motive, the complained of incident would not have occurred. *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). Mere conclusory allegations of retaliation will not withstand a summary judgment challenge. The existence of a proper disciplinary report, while not an absolute bar to a retaliation claim, is probative and potent summary judgment evidence, as would be evidence of the number, nature, and disposition of prior retaliation complaints by the inmate. *Id.*

Plaintiff says that, after he burned himself, he told defendant SANDERS. Defendant SANDERS avers the burn looked like a little red mark on plaintiff's cheek and appeared minor. He says he told plaintiff he needed to go to the infirmary and fill out an accident report since the injury happened at work. When plaintiff said he didn't want to go to the infirmary or fill out a report, SANDERS told him he had to. SANDERS then escorted plaintiff to the infirmary and fill out an accident report while plaintiff was being examined. [Docket Entry 53, Affidavit of Sgt. Granville Sanders, C3]. When he returned from the infirmary, plaintiff says he told defendant SANDERS the accident was a "tort" and SANDERS told him he would receive a disciplinary case for engaging in an unsafe act that resulted in his being burned. Plaintiff alleges that when he said the case was retaliatory, SANDERS replied they were just covering themselves.

Plaintiff interprets defendant SANDERS' remark that they were covering themselves to mean they were writing him a case because plaintiff implied he could sue. SANDERS' remark, however, like SANDERS' insistence that plaintiff go to medical to have his burn evaluated and that an accident report be filled out, is as likely to mean that plaintiff's injury, or any inmate

injury, was a situation that required documentation of all the circumstances surrounding its cause, including requiring TDCJ officials to address any unsafe act committed.

In this case, plaintiff has not and cannot show causation; that is, but for the retaliatory motive, the disciplinary case would not have been written. *McDonald*, 132 F.3d at 231. Plaintiff was simply charged with doing what he, himself, said he had done, and the fact that prison officials were making sure a record was made that plaintiff's actions were unsafe is not a retaliatory act.

That case was written by defendant SANDERS on the day of the accident and simply said plaintiff had engaged in an unsafe act that resulted in injury in that he "was working on the Mole [sic], went to get up and burned his face on the mufler [sic]." [Defendants' Exhibit F29 to defendants' motion for summary judgment]. The charge exactly mirrors plaintiff's own account of the incident to defendant SANDERS moments after it happened and also mirrors plaintiff's statement during the Disciplinary Hearing. [Defendants' Exhibit F10 to defendants' motion for summary judgment]. The disciplinary case for committing an unsafe act was later overturned because the description of the unsafe act was inadequate, but the case was eligible to be reheard at the option of unit officials.

The case was reheard. The unsafe act described in the subsequent disciplinary case was "[s]aid offender after operating the Mule and not allowing it to cool off did work on the Mule. Offender Walker then stood up and burned his face on the muffler." [Defendants' Exhibit 22].

In this context, Disciplinary Rule 44q is not so vague as to be constitutionally infirm. Plaintiff argues Rule 44q could be used to blame an inmate who doesn't step out of the way of a falling beam. [Plaintiff's Memo in Response to Defendants' Motion for Summary Judgement at

pg. 13].  Nevertheless, in this case, plaintiff was not merely the passive, if unlucky, victim.

Plaintiff actively committed a negligent act which caused or contributed to causing his injury,

not letting the engine cool before adjusting the idle.  While plaintiff contends the engine had to

be running at the time of the adjustment, such is merely his opinion and even if true, does not

excuse the plaintiff's responsibility.  The Court finds that Rule 44q, as applied, is sufficiently

explicit to allow a person of ordinary intelligence to understand what conduct on his part will

subject him to its penalties.  *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126,

127, 70 L.Ed. 322 (1926).

 As to plaintiff's next three charges, which constituted a single disciplinary case, they

were written by defendant CORLEY, plaintiff's supervisor.  Defendant CORLEY was not on the

unit on the day plaintiff was burned.  Defendant CORLEY was tasked with supervising plaintiff

and other maintenance inmates.  He states his usual procedure was to call the maintenance

inmates out to work if there was a project for them to work on.  He would take them to the inside

yard shed and sign out any necessary tools from the nearby maintenance building.  He would

then leave the shed to make his rounds and perform other duties, returning periodically to check

on the inmates in the shed throughout their shift.  He says there was an additional officer at the

turnout gate who also kept an eye on the inmates. [Defendants' Exhibit D1-2 to defendant's

motion for summary judgment].

 CORLEY avers that, with his permission, plaintiff and another inmate ordered parts to

repair the Kawasaki Mule but, after the parts were installed, the Mule still was not working

properly.  CORLEY says they determined it needed additional parts and he instructed them not

to work on the vehicle until the new parts arrived.  He says he also told them not to work on the

vehicle unless he or Chris Arzen (another inside yard boss) were working and available to help them. [Defendants' Exhibit D3 to defendants' motion for summary judgment].

Plaintiff contests this account and says defendant CORLEY never told him to refrain from working on the Mule unless CORLEY or Arzen were working and available.  Plaintiff also states that, at the end of November, 2010, when the first repair to the Kawasaki wasn't satisfactory, CORLEY put plaintiff on the phone with the Kawasaki dealership to talk about the problem and, "after speaking with the employee of the Kawasaki dealer, [plaintiff] was put back on the phone with [defendant CORLEY] and let him know that they were going to reorder the head but it was going to be the same part number and would most likely be the same [unsatisfactory] head."  Plaintiff goes on to say that then plaintiff "had someone in the [free] world contact Kawasaki directly to inquire upon [sic] this problem and they found out that the wrong head they had sent [initially] was in fact the same head that was on its way as there had been a design change yet this replacement head was not going to work."  Plaintiff says he then installed the old head after cleaning it and re-seating the valves.  He says he explained this to SANDERS and BOCKMAN who repeatedly said they needed the Mule.  [Plaintiff's Exhibit 3 at page Walker 000046, to his response to defendants' motion for summary judgment].  Even accepting plaintiff's account, it is clear, that defendant CORLEY never authorized plaintiff to install the old cylinder head but expected plaintiff to wait until the shipment of the new one, which CORLEY had no way of knowing was not the proper head.

Defendant CORLEY further avers that, on the date of plaintiff's accident, the additional new parts had not arrived and he, CORLEY, was not on unit, so that, when plaintiff worked on the Mule, he did so in contravention of CORLEY's orders.  Further, he says, when plaintiff ran

the Mule without the new replacement parts, he inflicted more damage on the Mule, causing it to

need still more repairs.  CORLEY says that, when he returned to the Unit, Lt. BOCKMON and

Sgt. SANDERS told him plaintiff had worked on and operated the Mule.  Defendant CORLEY

wrote plaintiff three disciplinary charges for (1) failure to obey orders; (2) destruction of state

property for damaging the Mule by running it without the additional parts; and (3) unauthorized

use of tools for using tools to work on the Kawasaki when the additional parts had not arrived

and CORLEY was not on unit. [Defendants' Exhibit D3 to defendants' motion for summary

judgment.]

Further, defendant CORLEY avers that he did not see plaintiff after his return to the Unit,

as he retired a couple of days later.  CORLEY says he did not appear at the Disciplinary Hearing,

but testified by telephone.   [Defendants' Exhibit D3 to defendants' motion for summary

judgment.].

Defendant CORLEY also avers he first became aware that plaintiff had written a letter or

presuit notice to the warden, defendant SAVERS, when he was served with this lawsuit.  He

states that at the time he wrote the disciplinary charges against plaintiff, he had no knowledge of

any communications between plaintiff and the warden or any other prison official.  [Defendants'

Exhibit D3 to defendants' motion for summary judgment.].

Plaintiff does not allege nor does he present evidence showing defendant CORLEY had

knowledge of plaintiff's letter to defendant SAVERS when he wrote the disciplinary cases and

has alleged no fact to support a claim of conspiracy involving CORLEY.  Plaintiff has failed to

present evidence to support his claim that defendant CORLEY's disciplinary charges were

written to retaliate against plaintiff for sending his letter or presuit notice to defendant SAVERS.

Plaintiff complains of the January 5, 2011 Classification Hearing conducted by defendant Warden SAVERS during which, plaintiff alleges, defendant SAVERS asked if plaintiff "kn[e]w what initiated all this, why all this happened?"  Plaintiff says he responded it was because he had been burned.  He states SAVERS shook his head and stated, "I'll tell you the truth.  I initiated all this because of your first letter. You threatened me."  Plaintiff says he asked SAVERS if he meant the presuit notice letter plaintiff sent and SAVERS responded, "Yes, that one. You threatened me."  Plaintiff says he replied there was nothing threatening in the letter and defendant SAVERS told him to read it again.  As a result of the classification hearing, plaintiff received a job change and his line class was adjusted from S3 to S4.  Even if the Court assumes, for purposes of argument, that plaintiff has shown retaliatory intent for the Classification Hearing, plaintiff does not provide any further information about the job transfer, whether it was to a better or less favorable job.  Further, plaintiff has not alleged he suffered any harm flowing from the classification change.  A prisoner bringing a section 1983 retaliation claim against prison officials must allege more than an inconsequential or *de minimis* retaliatory act to establish a constitutional violation.  Plaintiff has provided absolutely no allegation and has utterly failed to present evidence that the change in job assignment or classification harmed him in any way or, if it was less favorable, that the harm was more than *de minimis.*  Therefore, plaintiff has failed to state sufficient facts, much less to adduce sufficient evidence, to support his claim of retaliation.  *Morris v. Powell*, 449 F.3d 682, 687 (5th Cir. 2006).  Nor has plaintiff shown the result of the classification hearing was determined by defendant SAVERS, as opposed to the entire Classification Committee.

Lastly, plaintiff complains of a fifth disciplinary charge, for possession of contraband. Plaintiff says, on the day after the disciplinary hearing, two officers took all of plaintiff's personal property, saying defendant Warden SAVERS had ordered them to do so. Plaintiff alleges he was given some of the property back but some was confiscated, including a typewriter. Plaintiff says he was instructed to report to Officer Devaney, the Gang Officer, who informed plaintiff he didn't have papers showing ownership of the confiscated property. Plaintiff responded that he did have papers for his typewriter, explaining a Ms. Byars had asked who didn't have property papers and then issued them to him when he said he didn't have any papers for his typewriter [Plaintiff's Second Amended Complaint p. 11, par. 33]. Plaintiff says he was informed Ms. Byars "wasn't allowed to do this and that it would be considered as establishing a[n] [improper] relationship." [Plaintiff's Second Amended Complaint p. 11, par. 33]. Review of the Offense Report [Defendants' Exhibit F53] reveals that, to verify ownership, Officer Devaney reviewed plaintiff's trust fund records and found no records showing purchases of a radio, headphones, or typewriter. The property officer was also contacted and had no records of plaintiff having purchased a typewriter, radio, or headphones. Officer Devaney notes that he questioned plaintiff about the property and plaintiff admitted the property was not his. Further, he notes, plaintiff admitted having property papers for some of the property and that such papers were not appropriately obtained. [Defendants' Exhibit F53]. Review of the Disciplinary Hearing Report shows plaintiff pled guilty to the charge and admitted the property was left by his cellie when he was released. [Defendants' Exhibit F51, F54]. Plaintiff was found guilty and was punished by a temporary restriction of privileges, the loss of 30 days of goodtime

credits, and the confiscation of his contraband property, including the typewriter which he wants returned.

By requesting the return of the confiscated typewriter, plaintiff is challenging the outcome of the disciplinary hearing, not merely the reason for its inception. Therefore, although plaintiff is claiming retaliatory intent for the inception of the disciplinary charges, the result of a favorable judgment for plaintiff would call into question the confiscation of thirty days goodtime which he suffered along with the confiscation of the typewriter. To grant the relief requested, the Court would first have to find both the disciplinary charge (to which plaintiff pled guilty) and the determination of guilt to have been invalid. Thus, in plaintiff's challenge to the disciplinary case for possessing contraband, plaintiff seeks a judgment at odds with the state's calculation of time to be served and this claim is distinguished from that in *Muhammad v. Close*, 540 U.S. 749, 124 S.Ct. 1303, 158 L.Ed.2d 32 (2004). In the wake of *Edwards v. Balisok*, 520 U.S. 641, 117 S.Ct. 1584, 1589, 137 L.Ed.2d 906 (1997), the *Heck* doctrine is now applied to the prison disciplinary setting. For this reason, plaintiff's claim is not cognizable under section 1983 without a prior showing of favorable termination, that is, that the results of the disciplinary hearing have already been overturned, either on administrative appeal, through habeas, or by some other means. Consequently, plaintiff's claims regarding the final disciplinary charge of possession of contraband are barred by the *Heck* doctrine. *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 2372, 129 L.Ed.2d 383 (1994).

## CONCLUSION

For the reasons set forth above, it is clear that, drawing all reasonable inferences in favor of plaintiff, there is no material issue of disputed fact which precludes entry of summary

23

judgment for the defendant on the merits or on the issue of qualified immunity.  In addition,

plaintiff has failed to show he is entitled to partial summary judgment against any one or more of

the defendants.  Federal Rule of Civil Procedure 56(a).

Pursuant to 28 U.S.C. § 1915A(2), § 1915(e)(2), it is the RECOMMENDATION of the

United States Magistrate Judge to the United States District Judge that plaintiff's Motion for

Partial Summary Judgment be DENIED; defendant's Motion for Summary Judgment be

GRANTED; and that the claims by plaintiff STEPHEN C. WALKER be DISMISSED WITH

PREJUDICE.  It is the further RECOMMENDATION of the Magistrate Judge to the United

States District Judge that this Court decline to exercise pendent jurisdiction over plaintiff's state

law negligence claims, if any survive, and that they be DISMISSED WITHOUT PREJUDICE.

*United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Bass v.*

*Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999); *Corwin v. Marney, Orton Investments*, 843

F.2d 194, 200 (5th Cir.1988).

## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and

Recommendation to each party by the most efficient means available.

**IT IS SO RECOMMENDED.**

ENTERED this 8th day of March, 2013.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

## \* <u>NOTICE OF RIGHT TO OBJECT</u> \*

Any party may object to these proposed findings, conclusions and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).

25